IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 128,178

STATE OF KANSAS,
*Appellee*,

v.

RICO JERMAINE BROWN JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

When considering a challenge to a district court's ruling on a motion for mistrial pursuant to K.S.A. 22-3423(1)(c), an appellate court considers the record as a whole and reviews the district court's determinations of (1) whether prejudicial conduct occurred, and (2) whether curative measures mitigated the prejudice—i.e., rendered it harmless—for abuse of discretion.

2.

Judicial discretion is abused if the court's action is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion.

3.

In assessing a district court's ruling on a motion for mistrial or motion for new trial, past precedent discussing whether a "fundamental failure" has occurred is disapproved.

1

4.

When reviewing claimed prosecutorial errors in opening statements and closing arguments, an appellate court applies a two-step framework. First, the court considers whether the prosecutor exceeded their wide latitude to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. The court does not consider any statement in isolation but rather looks to the context to determine whether error occurred. Second, if error exists, the State must show beyond a reasonable doubt that the error did not affect the trial's outcome in light of the whole record, i.e., that there is no reasonable possibility that the error contributed to the verdict.

5.

Relevant evidence is generally admissible. Relevant evidence is evidence having any tendency in reason to prove any material fact. A material fact is one that has some real bearing on the decision in the case, and materiality presents a question of law that an appellate court considers de novo. Probative value flows from the tendency of the evidence to prove any material fact, and an appellate court reviews a district court's evaluation of probative value for abuse of discretion.

6.

Where there is but a single error, the cumulative error doctrine does not apply.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Oral argument held December 16, 2025. Opinion filed August 14, 2026. Affirmed.

*Emily R. Brandt*, of Kansas Appellate Defender Office, argued the cause, and *Lindsay Kornegay*, of the same office, was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

2

The opinion of the court was delivered by

WALSH, J.: In this direct appeal, Rico Jermaine Brown Jr. challenges his convictions for premeditated first-degree murder and felony first-degree murder, which arose from the shooting death of E.N. Featured among his many claims of error is the district court's ruling on his motion for a mistrial. Brown argues that significant prejudice resulted from various disturbances during his trial that were not cured by the court's responsive actions and that required the district court to declare a mistrial.

We disagree with Brown's arguments, and we affirm the district court's denial of the mistrial motion. Along the way, we identify and prune back an unchecked overgrowth of precedent that has obscured the appropriate standard that guides our review: abuse of discretion.

We specifically clarify that, when considering a challenge to a district court's ruling on a motion for mistrial pursuant to K.S.A. 22-3423(1)(c), we consider the entire record and review the determinations of (1) whether prejudicial conduct occurred—which is the defendant's burden, and (2) whether the prejudicial conduct was rendered harmless, i.e., whether curative measures sufficiently mitigated the prejudice—which is the State's burden, for abuse of discretion. We reject our prior use of "fundamental failure" language in favor of the relevant statutory language of K.S.A. 22-3423(1). And we conclude that in this case the district court did not abuse its discretion in concluding that, although prejudicial conduct occurred, its responsive actions mitigated or cured that prejudice and rendered it harmless.

Brown also argues that the district court should have granted a new trial based on juror misconduct; he raises several claims of prosecutorial error; he argues that the district court erred by redacting a portion of a previously admitted exhibit; and he asks

3

this court to reverse his convictions based on the cumulative effect of these alleged errors.

Because we conclude that Brown has established only one harmless prosecutorial error, we affirm his convictions and sentence.

FACTS AND PROCEDURAL BACKGROUND

*Underlying facts*

At about 10:20 p.m. on July 3, 2023, two cars pulled up to a stop light. Someone from one car fired several shots at the other car, killing the driver, 16-year-old E.N. The shooter's car then sped away.

Subsequent investigation determined that E.N. had been shot four times. Investigators found seven 9mm cartridge casings at the scene, all likely fired from the same gun.

No witness saw the shooting itself, and police received many tips to locate the suspect's vehicle. Eventually, they zeroed in on Dougqualynn Patterson's car.

Police arrested Patterson on July 6. In addition to four bullet holes on the driver's side of Patterson's car, police found a spent 9mm cartridge on the car's front cowl, near the base of the windshield wiper, which investigators determined was likely fired from the same gun that fired the cartridges found at the scene.

Police also searched Patterson's cell phone. The phone contained no GPS data from 9:51 p.m. to about 10:22 p.m. on July 3. (The infotainment center of Patterson's car also had no location data between 9:35 p.m. and 11:25 p.m. that night.) But police found

4

several messages between Patterson's phone and a contact named "Rico" on July 3 and 4. Critically, at 4:09 a.m. on July 3—the morning before the shooting—Patterson sent "Rico" the message, "I almost fucking died bro Omm"; in a separate message sent moments later, Patterson said, "Dooterz is dead Omm." (As he would later tell police, Patterson knew the victim, E.N., as "Lil Dooterz.") And later, at about 1:38 a.m. on July 4—several hours after the shooting—"Rico" said "they don't know shiy" and then sent Patterson a screenshot of a news article describing E.N.'s shooting.

Meanwhile, security cameras at a Valero gas station in Wichita documented that E.N. and Brown, Patterson, and Patterson's friend Kameron Solomon were all present at the gas station at overlapping times less than an hour before the shooting. Brown, Solomon, and Patterson were all in Patterson's car in the gas station parking lot, with Brown driving; when they noticed E.N., who arrived at about 9:40 p.m., they pulled away from the gas station. Brown then returned on foot, stood in line behind E.N. inside the store, and then—after getting his wallet out but apparently completing no transaction with the clerk—followed E.N. out of the store.

At about 10:02 p.m., around 19 minutes later, E.N. returned to the same Valero in a different car; he left again at about 10:08 p.m. By 10:20 p.m., he was dead.

*Detectives interview Patterson, Brown, and Solomon*

Detectives spent more than eight hours interviewing Patterson after his arrest. Patterson presented several different versions of events involving "Grim" (his name for Brown) and Solomon. Although Patterson initially claimed that he did not know how his own car had gotten bullet holes, Patterson eventually agreed to tell detectives "the full story"—after they confronted him with security camera images from the Valero and, perhaps more significantly, after they threatened him with a first-degree murder conviction if he maintained that he knew nothing.

5

According to Patterson's final version of the story, E.N. (whom he identified as "Lil Dooterz"), along with two other men, had robbed him at about 4 a.m. on the morning of July 3 and then shot at him as he was leaving. (Patterson sent "Rico" the above-noted texts shortly after this time frame.) E.N. and his compatriots had relieved Patterson of his cash, his gun, and his Patek Philippe watch, which he described as a "$180,000 watch" that he claimed to have gotten "from a friend." (E.N.'s mother later found the watch in the back seat of E.N.'s car.)

After the robbery, Patterson went to Brown's house and told him about it; according to Patterson, Brown said he would kill E.N. Patterson claimed that Brown was upset at Patterson for "letting [the robbery] happen and not shooting back" and for having "everything taken [from] me by some little kids."

Patterson and Brown then went "looking for [E.N.] all day"; that evening, they "just happened to see him" at the Valero. After they saw E.N., they waited for him to leave the gas station, followed him to his house (where he changed cars), lost him, saw him again at the same gas station, and then followed him until he stopped at a red light. Patterson said that he was in the back seat, while Brown was driving; when they stopped beside E.N.'s car, Brown leaned out the window and fired "like ten times" with a black handgun. Patterson saw E.N. slump over and assumed he had died. The men split up shortly thereafter. Patterson also said that Solomon had also been in their car but had nothing to do with the shooting, and had essentially just been along for the ride.

Police arrested Brown and interviewed him on July 8. Though Brown admitted he had briefly seen Patterson on the afternoon of July 3, he effectively denied any other involvement.

6

Police also arrested Solomon, who declined to make a statement at the time. At a later interview with detectives at his attorney's office, Solomon largely corroborated Patterson's account, albeit with minor differences; for instance, Solomon claimed Patterson was driving, while Patterson said that Brown had been behind the wheel. Critically, Solomon said that, when Patterson's car stopped alongside E.N.'s at the traffic light, Brown told Patterson to "pull up," then rolled down his window and fired at E.N. from the back seat. Solomon also claimed that he kept his head "straight" so he would not see anything.

At trial, Solomon mostly stuck with his story. While he expressed some uncertainty as to how he knew Brown was the shooter (since he claimed he kept his head "down" or "straight") he ultimately testified that Brown fired the shots.

*District court proceedings*

The State initially charged Brown with one count of first-degree premeditated murder.

The preliminary hearing spanned three separate dates. During the first portion of the preliminary hearing, Patterson told a different story than the final one he had given police. Patterson now said that he had lied about Brown's involvement because he was scared of the person who owned the watch E.N. had taken from him during the earlier robbery. By the final portion of the preliminary hearing, Patterson maintained that neither he nor Brown nor Solomon had anything to do with E.N.'s shooting.

At the conclusion of the preliminary hearing, the district court bound Brown over for trial, and permitted the State to add felony murder as an alternative charge.

The case went to jury trial. As we will discuss, several collateral problems cropped up during trial. The district court also initially admitted a defense audio exhibit, but later—after the State raised a concern about Solomon's attorney's comments in the first five minutes—the district court ordered that a redacted copy of the exhibit go back to the jury.

The jury ultimately found Brown guilty of both first-degree premeditated murder and first-degree felony murder. After denying a subsequent motion for new trial following an evidentiary hearing, the district court gave Brown a life sentence without possibility of parole before 618 months and merged the felony murder conviction into the premeditated murder conviction. Brown timely appealed to this court.

Jurisdiction is proper. K.S.A. 22-3601(b)(3)-(4).

ANALYSIS

I.     *The district court did not err in denying Brown's motion for a mistrial.*

Brown first argues that the district court erred by denying his motion for mistrial, which defense counsel made shortly before closing arguments based on "a cumulative standpoint." Brown argues that various distractions, outbursts, and interactions in the courtroom over the course of trial constituted multiple fundamental failures. Although we ultimately conclude that the district court did not abuse its discretion, Brown's argument offers us the opportunity to consider our precedent concerning mistrials.

A. *Standard of review and legal principles*

Although a district court enjoys inherent power to declare a mistrial "when justice so requires and there exists a manifest necessity to do so," K.S.A. 22-3423 also guides a

district court's exercise of its power to declare mistrials. *State v. Folkerts*, 229 Kan. 608, 614, 629 P.2d 173 (1981). Because Brown's motion arises under the "prejudicial conduct" subsection of that statute, our analysis implicates questions of statutory interpretation, which we review de novo. *State v. Scheuerman*, 314 Kan. 583, 587, 502 P.3d 502 (2022). To the extent we must review our own precedent—which also poses a question of law subject to de novo review—we must also consider the doctrine of stare decisis. *Zaragoza v. Board of Johnson County Commissioners*, 320 Kan. 691, 707, 571 P.3d 545 (2025) (stare decisis); *Northern Natural Gas Co. v. ONEOK Field Servs. Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013) (questions involving consideration and application of prior caselaw are subject to de novo review).

Under our well-established rules of statutory interpretation, the Legislature's intent remains our North Star, to the extent we can discern it. E.g., *Roe v. Phillips County Hospital*, 317 Kan. 1, 5, 522 P.3d 277 (2023). When that intent is plain from the statute's language, our analysis ends. But where a statute's language is ambiguous, we "'will consult our canons of construction to resolve the ambiguity.'" *Phillips County Hospital*, 317 Kan. at 5 (quoting *Johnson v. U.S. Food Service*, 312 Kan. 597, 601, 478 P.3d 776 [2021]).

We begin with K.S.A. 22-3423(1), which, since 1970, has provided that a district court may "terminate the trial and order a mistrial at any time that he finds termination is necessary because":

> "(a) It is physically impossible to proceed with the trial in conformity with law; or

> "(b) there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law and the defendant requests or consents to the declaration of a mistrial; or

9

"(c) prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution; or

"(d) the jury is unable to agree upon a verdict; or

"(e) false statements of a juror on voir dire prevent a fair trial; or

"(f) the trial has been interrupted pending a determination of the defendant's competency to stand trial." K.S.A. 22-3423(1).

Brown's arguments focus on subsection (c).

We have written that an appellate court reviews a district court's denial of a motion for mistrial for abuse of discretion. *State v. Younger*, 320 Kan. 98, 134, 564 P.3d 744 (2025). Judicial discretion is abused if the court's action is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Valenciana*, 322 Kan. __, __, 589 P.3d 599, 610 (2026).

But we have also written that K.S.A. 22-3423

"creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial." *State v. McCullough*, 293 Kan. 970, 980, 270 P.3d 1142 (2012).

As *McCullough* summarized, the statutory framework poses two questions, which we have articulated as: "(1) Did the trial court abuse its discretion when deciding if there

10

was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?" *McCullough*, 293 Kan. at 981.

But the words "fundamental failure" do not appear in the statute. This phrase first appeared in our jurisprudence in *State v. Lewis*, 238 Kan. 94, 97, 708 P.2d 196 (1985). There, the court considered the defendants' claim that the district court erred in refusing to declare a mistrial ostensibly based on K.S.A. 22-3423(1)(b), the "legal defect in the proceedings" subsection, based on a claim of prosecutorial misconduct. *Lewis*, 238 Kan. at 97.

In describing the district court's discretionary power to declare a mistrial, *Lewis* declared, perhaps rhetorically, that:

> "The granting of a mistrial is a matter within the discretion of the trial court. The judge's power to declare a mistrial is to be used only with great caution, under proper circumstances, to insure that all parties receive a fair trial. To insure that the trial judge has properly applied his discretion in granting or failing to grant a new trial, his actions are subject to review by appellate courts.
>
> "It is necessary when justice so requires to declare a mistrial *where there is some fundamental failure of the proceeding*. When an event of prejudicial misconduct, the damaging effect of which cannot be removed by admonition and instruction, is presented to the jury, the trial judge must declare a mistrial. In the present case, the State's introduction of evidence, of which the defendants' counsel were unaware and which destroyed the defense strategy, is such an event requiring a mistrial." (Emphasis added.) *Lewis*, 238 Kan. at 97.

Once planted, the "fundamental failure" term went to seed. We began analyzing prosecutorial errors through the lens of "fundamental failures" in the context of requests

11

for mistrials. E.g., *State v. Miller*, 308 Kan. 1119, 1163-64, 427 P.3d 907 (2018) (prosecutor's error in violating district court's order in limine creates a "fundamental failure in the proceedings").

Like a noxious weed, the "fundamental failure" language spread into the modern multi-part standard for applying and reviewing *any* claim of error in failing to grant a mistrial under K.S.A. 22-3423, including the "prejudicial conduct" subsection at issue here.

Our recent caselaw has summarized this supposedly "traditional rubric for considering a mistrial" this way:

> "'Applying [K.S.A. 22-3423(1)(c)], a trial court must engage in a two-step analysis. First, the trial court must decide if there is some fundamental failure of the proceeding. If so, in the second step of the analysis, the trial court must assess whether it is possible to continue the trial without an injustice. This means . . . that if there is prejudicial conduct, the trial court must determine if the damaging effect can be removed or mitigated by an admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial.'

> "In deciding whether it is impossible to proceed without an injustice after a fundamental failure in the proceedings, a court 'must assess whether the fundamental failure affected a party's substantial rights, which means it will or did affect the outcome of the trial in light of the entire record.' The applicable degree of certainty turns on whether the failure infringes on a right guaranteed by the United States Constitution—in which case the *Chapman* harmless error analysis applies.

> "On appeal, a district judge's decision denying a motion for mistrial is reviewed for abuse of discretion. An abuse of discretion occurs when:  (1) no reasonable person would take the view adopted by the district court; (2) the ruling is based on an error of law; or (3) the exercise of discretion is based on an error of fact.

12

"'Applying the abuse of discretion standard of review [to a motion for mistrial], an appellate court focuses on the two questions analyzed by the trial court and asks: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?'

"'An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis [as the district court], applying K.S.A. 60-261 and K.S.A. 60-2105 or else *Chapman*, depending on the nature of the right allegedly affected.' [Citations omitted.]" *State v. Carr*, 314 Kan. 744, 772-73, 502 P.3d 511 (2022) (quoting *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 [2011]).

See also *In re Care & Treatment of Sigler*, 310 Kan. 688, 706, 448 P.3d 368 (2019) (citing *Ward*, 292 Kan. at 550).

Worse, the "fundamental failure"-based construct has begun to choke out the deferential abuse of discretion standard, exchanging it for a de novo review. We have written that, as to the second *McCullough* question—whether any failure resulted in injustice—we do "not review the district court's decision for abuse of discretion but consider[] the entire record and perform [our] own constitutional harmless error review." *State v. Jenkins*, 308 Kan. 545, 556-57, 422 P.3d 72 (2018) (citing *State v. Corey*, 304 Kan. 721, 731, 374 P.3d 654 [2016]). We also articulated the basis for exercising an unlimited review over the second question, rather than confining our analysis to abuse of discretion:

"We have an advantage over the district court in analyzing the second step—the damaging effect of the fundamental failure in the proceedings—because we can look at the entire record of the trial, including what transpired after the district court denied the mistrial motion. *Waller*, 299 Kan. at 726 ('Appellate courts reviewing the second part for an injustice may take a broader view than the trial court because appellate courts may

13

examine the entire record.'). From that entire record, we must assess whether the harm or prejudice rose to the level of causing injustice." *State v. Moyer*, 306 Kan. 342, 357, 410 P.3d 71 (2017).

Prior to *Ward* and the proliferation of *Lewis'* fundamental failure language, our standard of review over a district court's mistrial rulings was decidedly simpler. For example, as *State v. Dixon* described the inquiry in 2009:

"Declaration of a mistrial is a matter entrusted to the district court's discretion, and the judge's choice will not be set aside without an abuse of that discretion. An appellate court's inquiry should consider whether a limiting instruction was given, the degree of prejudice, and whether any evidence improperly admitted would affect the outcome of the trial. [Citations omitted.]" *State v. Dixon*, 289 Kan. 46, 55, 209 P.3d 675 (2009).

See also *State v. Humphery*, 267 Kan. 45, 57, 978 P.2d 264 (1999) ("Terminating a trial and declaring a mistrial is largely within the discretion of the trial court. . . . 'The general rule is that an admonition to the jury normally cures the prejudice from an improper admission of evidence.' . . . When an event of prejudicial misconduct, the damaging effect of which cannot be removed by admonition and instruction, is presented to the jury, the trial judge should declare a mistrial."); *State v. Banks*, 260 Kan. 918, 926, 927 P.2d 456 (1996) ("Declaration of a mistrial is a matter entrusted to the trial court's discretion and will not be disturbed on appeal absent a clear showing of abuse of discretion.").

Our subsequent caselaw has further entrenched "fundamental failures" and uprooted the abuse of discretion standard by frequently assuming, without deciding, that a fundamental failure exists, and then moving on to the harmlessness part of the analysis. See, e.g., *State v. Butler*, 321 Kan. 493, 507, 581 P.3d 1261 (2026) (in the absence of trial court findings, assuming without deciding that a fundamental failure occurred); *State v. Owens*, 314 Kan. 210, 232, 496 P.3d 902 (2021) ("We presume without deciding that the failure to disclose Detective Chisholm's [firearms] demonstration before trial was a

14

fundamental failure in the proceeding."); *State v. Sean*, 306 Kan. 963, 989, 399 P.3d 168 (2017) (assuming district court found a fundamental failure based on district court's offer to give the jury an admonishment or limiting instruction); *State v. Kleypas*, 305 Kan. 224, 283, 382 P.3d 373 (2016) (*Kleypas II*) ("While we question whether giving an admonishment necessarily means a fundamental failure occurred [especially given the court's comments], given the State's concession, we will proceed on the assumption the court found a fundamental failure occurred."); *State v. Sherman*, 305 Kan. 88, 119, 378 P.3d 1060 (2016) (declining to "grapple" with the question of whether a fundamental failure occurred "when, as here, there is clearly no possible showing of prejudice").

We end this practice today. The import of an undefined, unprovenanced, and unworkable "fundamental failure" standard warrants correction. Cf. *State v. Moeller*, 318 Kan. 860, 864, 549 P.3d 1106 (2024) (under principles of stare decisis, a court will generally follow its own precedent unless it is "clearly convinced" that the precedent was originally erroneous and that more good than harm will come by departing from the precedent). And the ultimate decision under K.S.A. 22-3423(1) of whether it is necessary to "terminate the trial and order a mistrial" due to any of the statutory circumstances is a decision best left to the discretion of the district court.

As our difficulty in picking the appropriate noun reflects, we were not present in the courtroom when the fight, altercation, commotion, ruckus, etc. broke out. We did not hear the cell phones going off; we did not see the people coming and going from the courtroom; we did not see Solomon's mother gesturing or hear E.N.'s mother's "outburst" when the police body camera footage showed her child's body. While the district court and the parties made an admirable record of these matters for appellate review, that is all we can do here: review. Only the district court was seeing, hearing, and feeling the ambient pulse of the trial as it was happening. Its determination as to the severity of the disturbances and the impact of its responsive actions will not be reviewed de novo.

This deference is particularly appropriate here, where the motion for mistrial came at the conclusion of the evidence. We cannot say that our perspective is broader than the district court's: at the point the motion was submitted, the district court had practically all the information we have about the shape of the trial, and infinitely *more* organic information than we do about the atmosphere in the courtroom.

We hold that, when considering a motion for mistrial, the district court should first consider whether the defense has carried its burden of establishing that at least one of the circumstances set out in K.S.A. 22-3423 exists—or, in light of the inherent authority district courts continue to possess, "when justice so requires and there exists a manifest necessity to do so." *Folkerts*, 229 Kan. at 614. See *State v. Harris*, 313 Kan. 579, 585, 486 P.3d 576 (2021) (defense bears the burden of establishing an error under the first part of the test). As before, we will review this decision for abuse of discretion considering the record as a whole, "recognizing that a district court faced with a motion for mistrial 'is in the best position to observe the demeanor of those present, and to determine whether the accused has sustained substantial prejudice.'" *Kleypas II*, 305 Kan. at 280 (quoting *State v. Chears*, 231 Kan. 161, 166, 643 P.2d 154 [1982]).

Then, the district court must consider whether the State has carried its burden of proving harmlessness under the appropriate standard of certainty articulated by *Ward*. *Harris*, 313 Kan. at 585 (State bears the burden of proving that the prejudice can be removed or mitigated through curative measures). As to the "prejudicial conduct" subsection invoked here, that includes considering the impact of any curative or mitigating measures implemented. We also review this determination for an abuse of discretion and will only reverse where the court's action is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact.

In so holding, we ground the inquiry in the language of the statute and confirm that both determinations remain firmly rooted in the discretion of the district court.

Having clarified the standard guiding our review, we turn to the incidents Brown cites in support of his mistrial claim.

B. *The altercation in the hallway outside the courtroom*

Towards the end of the second day of trial, the attorneys approached the bench for a conference. The district court excused the jury at the end of this conference, then—after the jury had left—made the following record:

> "[T]here was probably eight to ten deputies that walked through as we were having a conference and that alerted all of us here at the bench. We turned around. They were walking out. There was a commotion out there and then someone, one of the attorneys . . . said there was a fight or dispute outside. Then we could hear some things.
>
> "I immediately excused the jury from the courtroom. Well, I made the record to remember the admonitions. They did quickly leave. This commotion was in the direction that they were facing, the way that our courtroom is set up. Our blinds are closed. There's maybe one blind that is a little open, but we could hear some things in the courtroom."

One of the deputies then told the court that "[a] group had left and went out. There was some yelling. I heard some cussing, didn't think much of it." Upon further investigation, "I heard another lady that was sitting somewhere here in the front row call somebody a bitch and told her she needed to relax and then that was when I called. I didn't see anybody throwing punches, but when I heard that they were fighting I just called [reinforcements]." The prosecutor later mentioned receiving information that one of the individuals "said something about Crips" which "probably provoked a reaction" that led to the altercation.

17

After a discussion with the attorneys, the district court brought the jurors back, admonished them not to do any independent investigation, and had deputies escort them to the parking garage. Among its other remarks, the district court told the jury, "We had a commotion out in the hall. I know everybody saw that."

After the district court dismissed the jury for the night, defense counsel asked the district court to clarify to the jury that the altercation did not involve either Brown's family or E.N.'s family. The district court did so the following morning. The district court also told the jury that it had ordered the individual responsible to be kept out of the courtroom and, thus, that "[i]t really does appear to be a one-off situation that we have a handle on now."

Without saying as much, the district court's behavior reflects that it appropriately recognized that the situation constituted prejudicial conduct that required corrective action. Cf. *Kleypas II*, 305 Kan. at 266-68, 275-82 (victim's father physically attacked defendant during the remand sentencing proceedings; district court correctly denied defense motion for mistrial after taking appropriate corrective actions, including immediately removing the jurors from the courtroom, questioning the jurors about their impartiality, and instructing the jurors to disregard the incident). The risk that the incident might have made the jury feel unsafe, or prejudiced it against one of the parties, was not de minimis, and the district court's actions sufficiently addressed both concerns. Moreover, while Brown now claims that the district court failed to sufficiently admonish the jury and failed to poll the jury, as occurred in *Kleypas II*, we cannot fault the district court for taking the actions defense counsel requested: it assured the jury that the individuals responsible for the fight had nothing to do with Brown's family or E.N.'s family. To do more would have risked placing undue emphasis on the incident which— from what the record suggests—appears to have largely occurred in the hallway outside the courtroom, even if it may have begun inside. Instead, by clarifying that the incident was unrelated to the families and addressing any potential safety concerns, the district

18

court adequately cured any prejudice caused by the altercation. The district court did not abuse its discretion in denying a mistrial on this basis.

### C. *Alleged witness coaching*

Brown next highlights what he describes as Solomon's mother's "attempt[] to coach him during his testimony." But the record does not support Brown's implicit argument that this incident involved prejudicial conduct, however.

This matter came to the district court's attention on the final day of trial, when defense counsel told the district court that, during Solomon's testimony, Solomon's mother "was somehow making hand signals." Outside the jury's presence, defense counsel proffered the testimony of an investigator for the Sedgwick County Public Defender Office. The investigator testified that, during Solomon's testimony, she had been observing Solomon's mother, who was sitting in the gallery. According to the investigator, when defense counsel was questioning Solomon "about his cognitive abilities," Solomon's mother "put her hand up" and made a motion with four fingers and a thumb, which she interpreted as a talking motion. The investigator also noticed Solomon's mother move her hand in a circular motion, which she interpreted as a hurry up sign, when Solomon asked counsel to "call him Kameron instead of Kam."

The prosecutor called an investigator for the DA's office. The DA's investigator was sitting behind Solomon's mother and testified that "she was trying to get somebody's attention in front of her." The investigator stepped around and asked if she was alright; "She said that's my son . . . and he takes some medications, when the medications start to run down he runs down, and I'm seeing what's going to happen and he is going to . . . lay over or slouch down or something." Perhaps a minute later, the investigator observed Solomon "slide down a little bit," at which point Solomon's mother said "I gotta get up there and I need to talk to my attorney, who was in front of her." The investigator told her

19

she could not get up. A minute later, she got the attorney's attention; "He said I'll be back there in a minute" and then Solomon "kind of sat up more, finished, and that was the end of it."

The district court found that, "I don't think there is any evidence that Mr. Solomon saw any actions by his mom as well as any evidence that the jury saw anything." The district court also said "I don't think we're at a point where we're in agreement to poll [the jury]" over the matter.

Brown cites *State v. Dayhuff*, 37 Kan. App. 2d 779, 158 P.3d 330 (2007), to support his claim. There, a child advocate was "nodding her head and making gestures" to a child witness on the stand and thus was "essentially coaching" the child's testimony. *Dayhuff*, 37 Kan. App. 2d at 796. But the district court refused to investigate, saying, *inter alia*, "We don't have the time to deal with this right now." 37 Kan. App. 2d at 796. On appeal, the panel chastised the district court for failing to investigate the matter at the time it occurred but, instead, for taking it up at a hearing seven months after trial—a delay that "[was] simply inadequate to investigate the matter as to how the child advocate's conduct may have impacted the child's testimony and affected the jury." 37 Kan. App. 2d at 801.

But we find *Dayhuff* distinguishable. The district court here investigated the matter thoroughly. The record supports its conclusion that, however the parties' investigators interpreted Solomon's mother's actions, no one presented any evidence that either Solomon or the jury saw anything. See *State v. Salazar-Moreno*, No. 106,555, 2013 WL 5925894, at *10 (Kan. App. 2013) (unpublished opinion) (no indication that the jury saw a gesture or could not recognize that the gesture was a reminder to sip water). Further, although the district court did not poll the jury, the defense counsel did not ask it to:  "We won't know [whether the jury "picked up on this"] without asking the jury. *I'm certainly not asking the Court to do that*." (Emphasis added.)

20

In short, the district court handled the matter properly by promptly investigating once the parties brought the matter to its attention, determining, based on the evidence, that no prejudicial conduct occurred, and moving on without drawing the jury's attention to a non-issue. No abuse of discretion occurred here.

D. *Miscellaneous distractions*

Brown also argues that various minor incidents in the gallery—including emotional reactions on the part of spectators, cellphones ringing, and people repeatedly entering and leaving the courtroom—so distracted the jury as to warrant a mistrial. To summarize some of these disruptions:

- On the second day of trial, just after the State played a short Axon video that included footage of E.N.'s body, counsel approached the bench. Defense counsel noted "an outburst in the courtroom from, it seems, [E.N.'s] family members." Counsel asked the prosecutor or the court to admonish the family "not to do that." A prosecutor explained that, in line with the prosecutors' conversation with E.N.'s family, that individual—apparently E.N.'s mother—had decided she could not control herself, and thus left the courtroom. When defense counsel suggested that "[t]he unfortunate part is that she stayed about a minute and a half" before leaving, the district court said, "I don't think it was near that long." The district court also said that "I'm not sure I would agree . . . that it was an outburst, but it certainly was crying and emotions, which that comes with these kinds of trials." At the district court's request, the prosecutors had a conversation with E.N.'s mother. A short while later, the court again discussed the need to "check the emotions" and to maintain order throughout the "emotional trial." The district court repeated this "because some of you weren't here when I made this statement" at the beginning of the next day of trial.

21

- After the lunch break on the third day of trial, the district court told the parties that it had "independently decided . . . to put some restrictions on the comings and the goings of persons in the gallery." The district court ruled that "if you leave the courtroom during a session, you cannot reenter the courtroom until there's a break." The district court explained that "I know it is distracting for me" from a courtroom management standpoint, but also noted that one of the jurors had told court staff "that it was becoming distracting with people coming and going." The prosecutor noted that "that door has been opening and closing a lot" and that "[i]t's distracted me and so I am not surprised that the Court and jurors or others have noticed it." After the jurors came back, the court informed them about its new rule; one of the jurors thanked the judge.

- Later on the third day of trial, during Detective Ken Davis' questioning, the district court said, "That is not going to happen again. . . . Just so everybody is clear, if we have reactions . . . demonstrative actions in response to anything that's going on in this side of the gallery, which would be the well and this part of the gallery, I'll remove that person from this trial. For how long, I don't know, but it's not acceptable, that kind of reaction." Neither the court nor the parties clarified what the reaction was, or who gave it.

- Near the end of the third day of trial—again, outside the jury's presence—the district court again told the courtroom, "I'm not going to tolerate any more—well, any outbursts, any reactions to evidence need to be internalized. I don't want to hear reactions to evidence. As I said, the remedy will be to remove you from the courtroom." Again, it is unclear what the outburst entailed.

- During the fourth day of trial, the district court interrupted questioning to tell the audience to silence their phones ("[t]hat's the second time I've had cell phones go

22

off") and to note that a "young girl" left the courtroom and that, if "she needs parental supervision," the rule on reentering the courtroom was still in place. The district court then suggested that it could prohibit anyone whose phone went off from reentering the courtroom.

The district court properly recognized that these disruptions warranted correction, and we discern no abuse of discretion in the district court's responses. Courtrooms are intrinsically contentious places, and although a district court has the inherent duty to maintain control over decorum, not every breach of that decorum necessarily jeopardizes a defendant's right to a fair trial. And even granting that some minor interruptions, outbursts, or distractions in a courtroom's gallery can constitute prejudicial conduct within the meaning of K.S.A. 22-3423(1)(c), the district court's corrective actions appropriately cured any prejudice. From what we can tell, Brown's trial was contentious, emotional, and—evidently—well-attended. That the district court did not have to intervene *more* often seems to be a testament to the efficacy of the measures taken by the court and the attorneys, whom the district court repeatedly complimented for their good work. Further, the district court's admonitions to the gallery largely occurred outside the jury's presence, thus limiting the degree to which those distractions weighed on the jurors' minds.

E. *Cumulative standpoint*

We have agreed that the incident in the hallway outside the courtroom and the various minor distractions throughout trial both constituted differing degrees of prejudicial conduct that warranted corrective action. And we have already held that the district court's actions were appropriate to cure any prejudice arising individually from these incidents. Brown's motion for mistrial also argued that these incidents collectively necessitated a mistrial, but we see no cumulative effect arising from them. The district court's individual responses dealt with the situations appropriately, one at a time, without

23

unduly drawing the jury's attention to them (and, thus, without distracting the jury from its fact-finding role). Although we do not discount the possibility of a mistrial by a thousand cuts in the appropriate factual scenario, Brown's trial does not present such a case. We thus conclude that the district court did not abuse its discretion in denying Brown's motion for mistrial.

II.  *The district court did not err in denying Brown's motion for a new trial based on alleged juror misconduct.*

Brown next argues that the district court erroneously denied his request for a new trial based on alleged misconduct by Juror Seven.

A. *Preservation*

Brown's attorney presented this issue in a motion for new trial, after which the district court held an evidentiary hearing before ultimately denying the motion at sentencing. Ordinarily, this would preserve the issue for appellate review.

But the State argues that Brown's motion for new trial was filed one day late and was thus untimely under K.S.A. 22-3501(1). The State concedes that it failed to challenge the timeliness of the motion before the district court but analogizes its argument to a claim that the district court lacked jurisdiction to consider the motion and, thus, suggests that it did not have to preserve the argument below.

We are unpersuaded. Although the State correctly notes that the 14-day deadline is "mandatory" under *State v. Holt,* 298 Kan. 469, 479, 313 P.3d 826 (2013), it stops short of asking the court to declare the limitation jurisdictional.

24

*Holt* offers the State little help. *Holt* considered whether the district court erred in summarily denying a motion for new trial filed 14 years after a defendant's convictions were affirmed on appeal, and 16 years after the date of conviction. *Holt*, 298 Kan. at 470, 473, 479. And while a concern over a "confusing[]" collision of appellate and trial court jurisdiction contributed to the court's conclusion that the time limitation was mandatory, *Holt* never declared that the limitation *itself* was jurisdictional. 298 Kan. at 477-78. Similarly, we have declared that, when a motion for new trial alleges ineffective assistance of counsel—which could qualify as "any other grounds" under K.S.A. 22-3501(1)—untimeliness "is a procedural flaw that may affect the defendant's right to counsel; but it does not deprive the district court or a later appellate court of jurisdiction." *State v. Reed*, 302 Kan. 227, 236, 352 P.3d 530 (2015). But see *State v. Lee*, 45 Kan. App. 2d 1001, 1021-22, 257 P.3d 799 (2011) (concluding district court lacked jurisdiction to consider an untimely motion under K.S.A. 22-3501). We thus hold that K.S.A. 22-3501(1) is not jurisdictional.

Consequently, because the State failed to challenge the timeliness of Brown's motion for new trial below, the State can only obtain appellate review if its claim falls under one of our discretionary preservation exceptions. E.g., *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010). The State argues that its untimely timeliness challenge falls under the third exception: the district court was right for the wrong reason. Because we ultimately conclude that the district court correctly rejected Brown's motion for a new trial, we decline to consider the State's alternative timeliness argument.

B. *Standard of review*

Under K.S.A. 22-3501(1), "The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." As with motions for mistrials, we reject past references to "fundamental failure" in our new trial motion jurisprudence and affirm that our review of a district court's ruling on a motion for new trial is for abuse

of discretion. *Holt*, 298 Kan. at 473. See also *Harris*, 313 Kan. at 585 (importing "fundamental fairness" language; recognizing "little practical difference as to whether the [prejudicial conduct] constituted a fundamental failure in the proceedings that made it impossible to proceed without injustice to the defendant, rather than the incident being so prejudicial to [defendant] that a new trial is required in the interest of justice"; noting that "[e]ither inquiry essentially asks the same question, i.e., whether the challenged event deprived [defendant] of a fair trial").

C.  *Additional facts*

At an evidentiary hearing on the motion for new trial, the defense presented evidence that Juror Seven was Facebook friends with one of the seven Facebook profiles used by C.M., E.N.'s older sister. C.M.'s profile had over 3,000 "friends" on Facebook. The defense presented no evidence of any interactions between Juror Seven and C.M. on Facebook, although it did show that Juror Seven had 19 mutual Facebook friends in common with E.N. or those in his family.

Additionally, the defense submitted school records suggesting that Juror Seven and C.M., who was a grade ahead of him, attended the same middle school for about one year, along with D.W., E.N.'s deceased brother, who appears to have been in Juror Seven's grade. Juror Seven and D.W. also seem to have attended the same high school for a time. The defense did not call Juror Seven and the parties did not present evidence of the sizes of the middle and high schools involved.

Finally, a defense investigator—who was present for every day of trial except jury selection—testified that E.N.'s mother was present in the courtroom for the remainder of the trial, while C.M. was present "at various times."

26

The district court ultimately denied the motion, finding that "there is just insufficient evidence to find juror misconduct" and that the defense asked the court to make "too great" of an "inferential leap of prejudice." The district court emphasized the absence of any evidence that Juror Seven "personally" knew E.N. or his family members, would have recognized C.M. (who did not testify during trial) in the courtroom, or would have recognized the connection between C.M., D.W., and E.N. As to the Facebook connections, the district court recognized that "the definition of Facebook friends has little substance and even less evidentiary significance. The evidence of 19 mutual digital Facebook friends provides insufficient evidence to prove, by inference or otherwise, juror misconduct."

D.  *Discussion*

Brown argues that the district court abused its discretion in concluding that Juror Seven did not commit misconduct by failing to disclose that he "knew" E.N.'s family members. Brown analogizes the situation to an unpublished Tennessee case, *State v. Montella*, No. M2020-00016-CCA-R3-CD, 2022 WL 1040126, at *18 (Tenn. Crim. App. 2022) (unpublished opinion).

In *Montella*, the defense introduced evidence of several Facebook interactions between a juror and the victim's family members, including at least one in which the juror said "love you" to the victim's mother. *Montella*, 2022 WL 1040126, at *11-13. Moreover, the juror testified that his uncle had been married to the victim's mother's aunt, although his uncle had since died. 2022 WL 1040126, at *13. The juror also testified that he recognized the victim's mother while she was testifying but did not notify the court "because he recalled the court's prior questioning and believed he could 'render an unbiased verdict, free from prejudice.'" 2022 WL 1040126, at *14, 16. With only the juror's self-serving testimony that he was unbiased as a counterweight, the appellate court ultimately reversed the defendant's conviction. 2022 WL 1040126, at *18.

27

*Montella* is distinguishable. Here, the defense presented no evidence of any Facebook interactions between Juror Seven and C.M., just the fact of their status *as* Facebook friends. Nor was there any evidence that Juror Seven was related to E.N.; E.N.'s mother testified that she did not know him. And Juror Seven was never called and thus never testified that he recognized anyone. Because the defense bore the burden of proving that the incident was so prejudicial to Brown as to warrant a new trial, this lack of evidence cuts against Brown's claim. Further, no party ever identified C.M. as E.N.'s sister during trial and she was never called as a witness. Nor would it necessarily have been obvious that she *was* E.N.'s sister, because—assuming Juror Seven even knew her real name—E.N. and C.M. do not share last names.

Consequently, we conclude that the district court did not abuse its discretion in denying Brown's motion for a new trial.

III.    *The prosecutor erred once, and the error was harmless.*

Brown next highlights five separate groups of prosecutorial errors arising from the prosecutors' opening statements, questioning, and closing arguments. We will discuss the specific facts relevant to each below.

When reviewing claimed prosecutorial errors in opening statements and closing arguments, we apply a two-step framework. First, we consider whether the prosecutor exceeded their wide latitude to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). We do not consider any statement in isolation but rather look to the context to determine whether error occurred. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020).

28

Second, if we find error, the State must show beyond a reasonable doubt that the error did not affect the trial's outcome in light of the whole record, i.e., that "there is no reasonable possibility that the error contributed to the verdict." *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021); *King*, 308 Kan. at 30. We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless, although the strength of the evidence is not our primary focus. *Blevins*, 313 Kan. at 437.

Although generally a defendant may raise claims of prosecutorial error on appeal without a contemporaneous objection below, alleged prosecutorial errors during questioning may involve evidentiary issues that, under K.S.A. 60-404, *do* require a contemporaneous objection. Cf. *State v. George*, 311 Kan. 693, 704, 466 P.3d 469 (2020) (alleged prosecutorial error in a question as to credibility "was an evidentiary issue, not a question of prosecutorial error"). Even so, a prosecutor can still err during questioning. *Sean*, 306 Kan. at 977.

Before we address Brown's claims, we first note the State's argument asking us to overturn our longstanding rule permitting defendants to raise claims of prosecutorial error for the first time on appeal without a contemporaneous objection. But the State correctly acknowledges that we recently rejected this argument in *State v. Coleman*, 318 Kan. 296, 307-11, 543 P.3d 61 (2024). As the State provides nothing to suggest that reconsideration is warranted, we again reject its request.

A. *Comments during questioning and closing arguments allegedly disparaging the defense*

Brown first argues that the prosecutor disparaged the defense attorney when questioning Detective Ken Davis and again during closing arguments. Defense counsel extensively cross-examined Davis, the case detective, during the second and third day of

29

trial. Throughout cross-examination, defense counsel repeatedly presented affidavits and reports by officers other than Davis, to which the prosecutors frequently objected on hearsay grounds. At one point during a bench conference, the prosecutor complained that "all we're doing is creating confusion and abusing the hearsay rule to do so," to which defense counsel responded, "Judge, I am not abusing the hearsay rule."

On redirect, the prosecutor asked Davis about a 911 call, to which defense counsel objected on hearsay grounds. In response, the prosecutor said, "No more than all these reports that got read into the record."

A short while later, while attempting to lay foundation for Davis' answer to a potentially critical question—"Was [Patterson] routinely texting a phone number associated with Rico Brown in the days leading up to the incident?"—the prosecutor told the court, "That was the foundation that was laid for most of her questioning, Your Honor, with all due respect." Defense counsel then asked the court if the parties could approach the bench and, outside the jury's earshot, asked the district court to "admonish [the prosecutor] from [maligning] me during his responses to my objections and conferring with the court" characterizing his "little quips" as "unnecessary, inappropriate and prejudicial." After observing that "I do remember one statement," the district court said, "[L]et's avoid commenting about the tactics or whatever of the other lawyers."

Later, the prosecutor began his closing argument rebuttal by saying:

> "I'm going to begin by talking about what we're actually here for. This is not the State of Kansas against Dougqualynn Patterson. That trial may come. *I may see if [defense counsel] is available. She should be prosecuting that case*." (Emphasis added.)

30

Defense counsel objected and the district court sustained the objection. The prosecutor then continued to discuss the theme of who the State's case was *not* against (which ultimately produced another claim of prosecutorial error, as discussed below).

> "'[F]air comment on trial tactics and the interpretation of evidence is allowed, so long as care is taken not to inappropriately denigrate opposing counsel or inject personal evaluations of the honesty of witnesses.'" *State v. Butler*, 307 Kan. 831, 865, 416 P.3d 116 (2018) (quoting *State v. Crum*, 286 Kan. 145, 150, 184 P.3d 222 [2008]).

While perhaps ill-taken and likely borne of frustration over the district court's permissiveness as to "all these reports that got read into the record," the first challenged remark—"[t]hat was the foundation that was laid for most of her questioning"—was not error. A prosecutor's responses to objections may constitute error, but "the *target* of such comments is the judge—not the jury." *State v. Smith*, 320 Kan. 62, 78, 563 P.3d 697 (2025). Moreover, while we might characterize the prosecutor's comment as unnecessarily snarky, it correctly recognized that the district court had permitted the defense to cross-examine Detective Davis about several reports not authored by him on the theory that he was the "funnel" detective, and that he reviewed other officers' work to make critical decisions about the investigation. Thus, we see no error.

The prosecutor's remark during rebuttal gives us more pause. In *State v. Knox*, 301 Kan. 671, 684, 347 P.3d 656 (2015), we cautioned prosecutors to avoid "disparag[ing] the role of defense counsel in the adversarial process." Further, we wrote that, "To suggest the purpose of a criminal defense attorney is to take bystanders who happen to witness a crime and portray them as deceptive and dishonest demeans both the adversarial process and defense counsel's role in that process, and it is misconduct." *Knox*, 301 Kan. at 684.

But although this remark was closer to the line, it did not cross it. As the State correctly points out, the prosecutor's argument ultimately commented on the theory of defense: namely, that Patterson shot E.N. and blamed Brown to protect himself. Much of Brown's defense thus focused on demonstrating Patterson's guilt, which aligns generally with the prosecutor's remark. While we question the professionalism of that remark, it was not error to point out that the defense strategy, generally, was to show that Patterson was the shooter.

B. *Questioning that allegedly encouraged burden shifting*

Returning to the prosecutor's redirect examination of Detective Davis, Brown next argues that the prosecutor shifted the burden of proof by rhetorically asking, in reference to Patterson's more than eight-hour long police interview, "If defense wanted to, they could just introduce the darned eight hours. Right?" Defense counsel immediately objected that the prosecutor was trying to shift the burden. While the district court disagreed, it sustained the objection because it was an "improper question." The next day, the defense indeed introduced the full recording of Patterson's interview as a defense exhibit.

Now on appeal, Brown maintains his argument that the prosecutor erred by suggesting to the jury that the defense could or should have simply introduced the full recording and that this error left the defense with no other option but to introduce the full video. In response, the State cites *State v. Blansett*, 309 Kan. 401, 413-15, 435 P.3d 1136 (2019), where the court found no error in a prosecutor's remark that the defense could admit videotaped interviews if it wished—although, as Brown points out, unlike *Blansett*, the prosecutor here was the first to point out the absence of the full video.

> "It is improper for the prosecutor to attempt to shift the burden of proof to the defendant, but prosecutors are granted wide latitude to address the arguments and

32

weaknesses of the defense. A prosecutor does not shift the burden of proof to the defendant by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding deficiencies in the State's case. Likewise, a prosecutor does not shift the burden of proof by posing a general question about the lack of evidence offered to rebut the State's witnesses. Moreover, '[t]he prosecutor's comment must be evaluated in context and can be mitigated by jury instructions regarding the burden of proof.' [Citations omitted.]" *State v. Watson*, 313 Kan. 170, 176-77, 484 P.3d 877 (2021) (quoting *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 [2012]).

Here, "[t]he challenge lies in identifying the line between a prosecutor's proper comments on a defense or defendant's evidence and improper burden-shifting." *State v. Anderson*, 318 Kan. 425, 437, 543 P.3d 1120 (2024). Admittedly, "'[W]hen the defense creates an inference that the State's evidence is not credible because the State failed to admit a certain piece of evidence, the State may rebut the inference by informing the jury that the defense has the power to introduce evidence.'" *State v. Hachmeister*, 311 Kan. 504, 516, 464 P.3d 947 (2020) (quoting *Blansett*, 309 Kan. at 415).

Of course, "as we have often said, context matters." *Blansett*, 309 Kan. at 412. Although the defense did not attack the State's failure to introduce the recording, much of the defense's cross-examination of Detective Davis focused on the tactics and circumstances surrounding Patterson's interrogation, including a lengthy walk-through of the interview that required the detective to watch several clips of the video itself, repeatedly interrupting the questioning. With this context in mind, the prosecutor seems to have been commenting that the defense could have more easily made its point by simply showing the jury the full interrogation, rather than picking it apart piece by piece. While the prosecutor could have phrased this remark differently—and should have, the district court sustained the defense's objection—we do not view it as an attempt to shift the burden of proof.

C. *Comment in closing arguments allegedly misstating what the jury could consider in its verdict*

Brown next argues that the prosecutor erred again in rebuttal by stating that:

> "This is not the State of Kansas against the Wichita Police Department or [Detective] Davis. If you have problems with what he did, what the police department did, when this is all done, walk right across the street and you talk to that chief and give him the what for. That's how you deliver that message, not in your verdict. This is the State of Kansas against Rico Brown."

Brown claims that, with this remark, the prosecutor both attempted to shift the burden of proof and asked the jury to consider facts outside of the evidence. While we again disagree that the prosecutor was trying to shift the burden of proof here—as before, much of the defense's theme focused on the police's investigation—we agree that this remark erroneously suggested that the jury could consider irrelevant matters—or should not consider relevant matters—in making its decision.

In *State v. Roeder*, 300 Kan. 901, 936, 336 P.3d 831 (2014), we concluded that a prosecutor's references to irrelevant factors "distracted the jury from its role as factfinder and were designed to elicit anger and resentment in the jury." See also *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013) ("This court has repeatedly emphasized that it is improper for a prosecutor to comment on facts not in evidence, to divert the jury's attention from its role as factfinder, or to make comments that serve no purpose other than to inflame the passions and prejudices of the jury."). Here, the quality of the police's investigation was central to the defense's theme, and the prosecutor thus erred by suggesting that the investigation—including the circumstances surrounding Patterson's interview—was somehow unrelated to the jury's work, and that the jury could lay concerns regarding the reliability of the investigation at the feet of the chief of police

34

instead of considering it when assessing Brown's guilt. We evaluate the harmlessness of this error below.

### D. *Questions allegedly trying to influence Solomon's testimony*

Brown next claims that the prosecutor tried to improperly influence Solomon's testimony on the stand. Critically, during an exchange on redirect in which the prosecutor asked Solomon who shot at E.N.'s car, the prosecutor said, "Do you understand that no matter how you testify today, there always remains a possibility that you could be charged in this case?"

But Brown made no timely, specific objection to this question, as required by K.S.A. 60-404. In explaining the interaction between K.S.A. 60-404 and a claim of prosecutorial error, we have said that "evidentiary claims—including claims concerning questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection before those claims may be reviewed on appeal." *State v. King*, 288 Kan. 333, Syl. ¶ 5, 204 P.3d 585 (2009).

When a defendant's prosecutorial error claim is "truly an evidentiary question," i.e., "*any claim relating to a prosecutor's questions or answers during direct or cross-examination*, or any other claim relating to the admission or exclusion of evidence," then the "defendant's characterization of the issue cannot avoid the statutory requirement of K.S.A. 60-404." (Emphasis added.) *King*, 288 Kan. 333, Syl. ¶ 6; see also *State v. Waldschmidt*, 318 Kan. 633, 650, 546 P.3d 716 (2024); *George*, 311 Kan. at 700-04. Because defense counsel failed to contemporaneously object, this issue is not preserved for our review.

35

E. *Comments allegedly insinuating Brown was affiliated with a gang*

Finally, Brown claims that the prosecutor's references to "associates" and "street justice" five times between opening statements and closing arguments constituted error. Brown claims that these references violated the district court's pretrial order prohibiting mention of gang activity, suggested facts not in evidence, and improperly inflamed the passions of the jury. Brown also suggests that the prosecutor's words have "racial bias implications" because Brown, a Black man, was tried by an almost all-white jury.

Before trial, Brown filed a motion in limine to prohibit "any mention of, or insinuations of, Mr. Brown's perceived alleged gang affiliation, if any." The State did not oppose, averring it "[wa]sn't seeking to admit gang evidence," and the district court granted the motion.

In opening, the prosecutor said, "Revenge, retribution, *street justice*, whatever word you might use, the evidence will show that's what this case is about." (Emphasis added.) The prosecutor then highlighted how E.N. robbed Patterson and then said that "[b]y the end of that day, one of [Patterson's] friends *and associates*, the defendant, Rico Brown, gunned him down." (Emphasis added.)

Later, at the beginning of closing arguments, the prosecutor reiterated the words "[r]evenge, retribution, *street justice.*" (Emphasis added.) The prosecutor then described how E.N. "and his friends or *associates*" robbed Patterson before going on to say that, by the end of the day, "Patterson and Rico Brown measured out their own version of justice." (Emphasis added.) Still later, the prosecutor discussed Patterson's interview comments that he was scared and "doesn't want to be a snitch": "In the world of *street justice*, is that confusing or shocking?" (Emphasis added.)

36

Brown's argument relies on the premise that the phrases "associates" and "street justice" "improperly suggest gang activity or affiliation." But we find this assumption unpersuasive.

First, while Brown cites cases merely using the term "associate" in describing gang activity, these cases do not show that the word "associate" necessarily connotes gang activity. *Peppers*, 294 Kan. at 381, 391; *State v. Winston*, 281 Kan. 1114, 1123, 135 P.3d 1072 (2006). The English lexicon only contains so many words to describe interpersonal relationships. That multiple Kansas appellate courts, handicapped by their shared adherence to English, should describe ambiguously affiliated individuals as "associates" suggests nothing about what a *jury* would have understood when it heard this term. Cf. *State v. Warren*, 302 Kan. 601, 613, 356 P.3d 396 (2015) (characterizing detective's reference to defendant "and his associates" as "more isolated and innocuous" than another case's single aberrant reference to "gang officers").

Second, in the references to both "associates" and "street justice," the prosecutor also applied other synonyms as an apparent nod to the ambiguity of the evidence concerning how Brown knew the other individuals involved. The prosecutor called Brown one of Patterson's "friends *or* associates" and characterized "street justice" as another form of "revenge" or "retribution." (Emphasis added.)

Finally, prosecutors enjoy wide latitude in discussing the evidence and drawing reasonable inferences from it. *Timley*, 311 Kan. at 949. We have held that a prosecutor's mention of "street justice," "in the context of describing the evidence" and "explaining the motive for murder," was not error. *State v. Williams*, 299 Kan. 509, 543, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Here, the prosecutor's argument about "street justice" centered entirely on the motive for the killing, which the prosecutor linked with E.N.'s robbery of Patterson earlier that day. Thus, we find no error in these remarks.

37

F. *Harmlessness*

To recap, we have found one prosecutorial error in the prosecutor's comment that the jury could complain to the chief of police after trial. The State thus bears the burden of establishing this error was harmless beyond a reasonable doubt. We conclude that the State has done so here. The State's case against Brown was not overwhelming—although ample evidence implicated Patterson's car, either Patterson or Brown could have been the shooter—the prosecutor's error was also limited in its impact. It risked, at worst, redirecting any jury misgivings with the policework onto the chief of police rather than incorporating it into the reasonable doubt analysis. But the erroneous comment was a blink-and-you'll-miss-it moment about a tangential point during a heated, lengthy trial. We are convinced, beyond a reasonable doubt, that the error did not impact the jury's verdict.

IV. *The district court did not err by redacting the first five minutes of a previously admitted, unpublished defense exhibit.*

Brown next challenges the district court's decision to redact the first five minutes of Solomon's interview, which had previously been admitted in full—but not yet published to the jury—in response to a late objection by the State.

The focus of the parties' competing and sometimes confusing arguments is relevance. Relevant evidence is generally admissible. K.S.A. 60-407(f). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). "Material evidence is evidence that supports a fact in dispute or in issue in the case, and evidence is probative when it has a logical tendency to prove a material fact." *State v. Dean*, 298 Kan. 1023, 1033, 324 P.3d 1023 (2014). A material fact is one that has some real bearing on the decision in the case; materiality presents a question of law that

appellate courts consider de novo. *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022). Probative value flows from the tendency of the evidence to prove any material fact, and we review a district court's evaluation of probative value for abuse of discretion. *Alfaro-Valleda*, 314 Kan. at 533; see *Miller*, 308 Kan. at 1166-67. To the extent Brown argues that the district court's decision violated his right to present a complete defense, we review the alleged error de novo. *Smith*, 320 Kan. at 80.

A. *Additional facts*

On December 12, 2023, detectives interviewed Solomon at the office of his attorney. The detectives recorded the audio of that interview.

The context of the audio suggests that Solomon was not present in the room initially. Throughout the first five minutes, Solomon's attorney and the detectives discussed Solomon's cognitive issues, therapy, and medication status, along with other collateral matters such as scheduling.

The issue of the admissibility of comments on cognitive issues and medications was raised and ruled on the day before the defense sought to introduce the recording of Solomon's interview.

While cross-examining Solomon, defense counsel started to ask Solomon about his knowledge of "cognitive issues" (none) and whether Solomon knew he had "cognitive issues" (no). When defense counsel asked whether Solomon remembered his attorney telling Detective Davis that Solomon had "cognitive issues," the prosecutor objected, noting that Solomon was not in the room during the early portion of the recording during which Solomon's attorney is talking about Solomon's "cognitive issues."

39

The prosecutor also argued that Solomon's attorney's comments constituted hearsay and were "not an authoritative statement" of Solomon's mental status. The district court ultimately sustained the objection because "what I don't believe is relevant is [Solomon's attorney's] opinion about his mental health and using the term cognitive."

Of course, the interview itself was not subject to objection, so when the defense offered the exhibit containing Solomon's interview on the following day, the State did not object. The district court admitted the exhibit, although it was not played for the jury.

The next day, the district court noted that "last night or sometime [the prosecutor] remembered or realized that the first five minutes [of the exhibit] is [Solomon's attorney and Detective Davis] talking about the set-up for the interview." The district court said that this portion of the exhibit "talks about medication, cognitive issues, motivations in doing this, fear of other guys reaching out, which by inference would be the codefendants in this case. There's a reference to listening to jail calls and that sort of thing." While admitting that "[i]t's in" evidence already, the prosecutor asked the court to redact the first five minutes of the exhibit before sending it back with the jury. The prosecutor clarified that he had agreed to the admissibility of Solomon's statements only, not the remarks of his counsel when Solomon was not present.

The district court agreed that there was no "meeting of the minds" and that the prosecutor "didn't know what they were agreeing to" and thus ordered the redactions.

B. *Discussion*

Brown attacks both the district court's ultimate decision to redact the exhibit and, relying on the contemporaneous objection rule in K.S.A. 60-404, challenges the district court's ability to consider the prosecution's "late objection" at all.

40

We dispose of the latter argument first: the statute's plain language demonstrates that it does not control here. The prosecutor was not attempting to set aside a verdict or finding and was certainly not seeking any judgment to be reversed. Consequently, K.S.A. 60-404 did not prohibit the district court from considering the prosecutor's late objection and accompanying request for redactions.

Turning to the district court's decision to redact, the State focuses on the hearsay nature of the redacted portion of the exhibit, rather than its relevance. Brown insists that the statements were not offered to prove the truth of the matter asserted—"that [Solomon] actually had cognitive issues or problems with his medication"—but rather "to corroborate that [Solomon] was an unreliable witness." Brown claims that these statements could impeach Solomon "because he claimed in his earlier trial testimony that he did not know whether he had cognitive or mental health issues." Brown also claims that the unredacted views of Solomon's attorney would have allowed him to "fully challenge the crucial issue of [Solomon's] reliability as a witness."

But although Solomon's reliability was a material fact in dispute, his attorney's statements—*without* Solomon's apparent presence in the room at the time—lack any "logical tendency" to prove whether or not Solomon knew he had cognitive or mental health issues. *Dean*, 298 Kan. at 1033. If Solomon had not heard his attorney's statements to detectives, as the context of the recording suggests, those statements are not relevant to Solomon's knowledge. Consequently, we affirm the district court's initial conclusion: Solomon's attorney's statements were not relevant because they were not probative, at least not as to Solomon's reliability as a witness. Because there is no indication that Solomon knew what his attorney said, the district court did not abuse its discretion in ordering the redaction.

Nor did the belated redaction of this irrelevant evidence impact Brown's ability to present his defense, i.e., that Patterson was the shooter and that Solomon's testimony that

41

it was Brown was unreliable. The jury had already heard that Solomon had schizophrenia and bipolar disorder, was taking medications, sometimes forgot to take his medications, and that his medications had changed over time. Defense counsel's cross-examination and Solomon's equivocation on the stand put Solomon's reliability squarely before the jury. Excluding Solomon's attorney's statements, made outside of Solomon's presence, did not violate Brown's constitutional right to present a complete defense.

V.     *Without multiple errors, cumulative error does not apply.*

Brown also raises a claim of cumulative error. But because we have only identified one individually harmless prosecutorial error, the cumulative error doctrine does not apply. E.g., *Butler*, 321 Kan. at 517-18. Consequently, we affirm Brown's conviction and sentence.

Affirmed.

LUCKERT, J., not participating.